UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
A.S., individually and on behalf of A.B.,

                                  Plaintiff,

        - against -

MAMARONECK UNION FREE SCHOOL
DISTRICT,

                                  Defendant.
------------------------------------------------------------x

**OPINION & ORDER**

No. 21-CV-6937 (CS)

<u>Appearances</u>:

Gina M. DeCrescenzo
Gina DeCrescenzo, P.C.
White Plains, New York
*Counsel for Plaintiff*

Mark C. Rushfield
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

      Before the Court are the cross-motions for summary judgment of Defendant Mamaroneck

Union Free School District ("Defendant" or the "District"), (ECF No. 44), and Plaintiff A.S.

("Plaintiff" or "AS"), acting individually and on behalf of A.B. ("AB"), a child with a disability,

(ECF No. 49).  Plaintiff brings this action pursuant to Section 504 of the Rehabilitation Act of

1973, 29 U.S.C. § 794 ("Section 504"), and Title II of the Americans with Disabilities Act, 42

U.S.C. § 12131 *et seq.* (the "ADA").  For the following reasons, the District's motion is

GRANTED and Plaintiff's motion is DENIED.

## I.      BACKGROUND

### A.      Facts

The following facts are based on the parties' Local Civil Rule ("LR") 56.1 Statements,

((ECF No. 45 ("D's 56.1 Stmt."); ECF No. 51 ("P's 56.1 Stmt.")), their responsive LR 56.1

Statements, (ECF No. 50 ("P's 56.1 Resp."); ECF No. 55 ("D's 56.1 Resp.")), and the supporting

exhibits, and are undisputed unless otherwise noted.[1]

### 1.      AB's 2017 - 2019 School Years

AB attended the Mamaroneck Avenue School from September 2017 to November 2019.

(P's 56.1 Stmt. ¶ 2).  Soon after he began kindergarten, the school staff referred him for a

---

[1] Both parties' LR 56.1 Statements fail to comply with the letter and spirit of the rule. Many of Plaintiff's purported denials "[d]ispute[] that th[e] statement of fact relates to or is material to any triable issue of fact currently in dispute," (P's 56.1 Resp. ¶ 9), and refer back to responsive ¶ 9, which lists the respects in which the District allegedly failed to properly administer a "time out room," even though most of the statements to which Plaintiff was purportedly responding had nothing to do with the time out room, (*see id.* ¶¶ 17-22, 24, 26-37, 39-44, 46-47, 49, 55, 59-60.)  Responses that "do not point to any evidence in the record that may create a genuine issue of material fact[] do not function as denials, and will be deemed admissions of the stated fact."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012); *see Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses where plaintiff failed to specifically dispute defendant's statements).  (Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.)  Where Plaintiff does not meet her burden under Federal Rule of Civil Procedure 56(c)(1) and LR 56(c) to cite particularized evidence showing a genuine dispute, the Court deems Defendant's statements admitted if properly supported.  *See, e.g.*, *Johnson v. City of N.Y.*, No. 10-CV-6294, 2012 WL 1076008, at *3 (S.D.N.Y. Mar. 28, 2012) (court is not obligated "to perform an independent review of the record to find proof of a factual dispute"); *Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-CV-7639, 2016 WL 4098564, at *1 n.2 (S.D.N.Y. July 28, 2016) (to the extent objections are unsupported, court treats "properly-supported factual proffers as admitted"); *Weider Health & Fitness v. AusTex Oil Ltd.*, No. 17-CV-2089, 2018 WL 8579820, at *2 (S.D.N.Y. Dec. 19, 2018) (same), *report and recommendation adopted*, 2019 WL 1324049 (S.D.N.Y. Mar. 25, 2019).  Several of Defendant's 56.1 responses also contain purported denials that do not actually deny or refute the specific facts asserted by Plaintiff, but instead quibble with Plaintiff's phraseology.  (*See, e.g.*, D's 56.1 Resp. ¶¶ 5, 7-8, 12, 16-21.)  In these instances, the Court will deem Plaintiff's facts admitted where the record evidence supports Plaintiff's contentions.  *See Warren v. Ewanciw*, No. 15-CV-8423, 2019 WL 589488, at *2 n.4 (S.D.N.Y. Feb. 13, 2019).

Functional Behavior Assessment ("FBA").  (ECF No. 46-7 ("IHO Decision") at 6.)  The report

of the FBA performed on October 16, 2017, concluded that AB engaged in challenging behavior

and recommended that a formal Behavioral Intervention Plan ("BIP") be generated "to target a

reduction in A[B]'s acting out behaviors and increase in his ability to use more appropriate

replacement behaviors" to increase his ability to learn.  (D's 56.1 Stmt. ¶ 18; *see* IHO Decision at

6.)  The BIP created for AB recommended that if his behavior escalated to a point where he

became physical, removal from the environment might be required, and that such removal should

be executed by trained staff utilizing a team approach.  (D's 56.1 Stmt. ¶ 19.)  The BIP further

provided that, if removed, AB should be moved to a safe location close by, given the opportunity

to de-escalate, and reintroduced to his class when the team determined he was ready.  (*Id.*)

Although the BIP did not use the term, these provisions related to the use of the "peace

room" to address AB's dysregulated behavior.  (*Id.*)  The "peace room," overseen by school

administrators, was a space to which any student could go, by choice or direction, to de-escalate

in the presence of school staff when staff felt it was not safe for the student to remain in the

previous environment.  (*Id.* ¶ 32.)  It was never locked and contained sensory tools for students

to use to regulate themselves.  (*Id.*)  The District deemed the peace room an appropriate

intervention for AB and a safer option than having his behaviors escalate in the classroom in

front of his peers.  (*Id.*)  The use of the peace room always helped AB to de-escalate his

dysregulated behaviors.  (*Id.* ¶ 33.)  The amount of time spent in the "peace room" depended on

how long it would take the student to calm down enough to reintegrate into the class; the District

imposed no specific time limitations.  (*Id.* ¶ 11.)  All District staff who worked with children

who potentially could become dysregulated received Crisis Prevention Institute training in

de-escalation, restraints, post-intervention review and the use of a therapeutic room like the

peace room.  (*Id.* ¶ 39.)  It is undisputed that AB's disability-related behaviors sometimes required his removal from the classroom.  (P's 56.1 Resp. ¶ 68.)

During AB's kindergarten year, the District provided supports in addition to the FBA and BIP.  (D's 56.1 Stmt. ¶ 20.)  From October to January, District school psychologist Dr. Lavinia Marchis met with a social worker and AS, almost on a weekly basis, concerning behavioral strategies being used in school to address AB's behavior.  (*Id.* ¶ 30.)[2]  In trying to support AB's behavioral needs, AS was aware that AB's teachers would provide reinforcements throughout the day regarding AB's expected behavior and would sometimes remove AB to the peace room and need to restrain him.  (*Id.* ¶ 43.)  The District would track, document and provide notice of the use of restraints if the student involved was classified with a disability, (*id.* ¶ 34), as AB was in November 2017, as discussed below.  A parent of a child subjected to a physical restraint by District staff, including the parent of AB, would receive notification of the restraint.  (*Id.* ¶ 40.)  AS received notice of AB having to be restrained as early as when he was in kindergarten, at which time she also became aware that the District had a policy on restraints.  (*Id.*)  The District's team would meet to discuss the incidents involving AB, review the event, and discuss the antecedent behavior, the effort to address that behavior, the events that followed and how the behavior might be addressed differently.  (*Id.* ¶ 42.)

AB was referred to the Committee on Special Education ("CSE") in the fall of his kindergarten year.  (IHO Decision at 6; *see* D's 56.1 Stmt. ¶ 24.)  During a classroom

---

[2] Defendant's 56.1 Statement indicates that these meetings occurred from October 2017 to January 2020, but that is inconsistent with Dr. Marchis' testimony.  When asked to elaborate on "speaking to A[B]'s mom concerning the behavioral strategies that were being used in school *during his kindergarten school year*," (ECF No. 46-14 at 332:7-10) (emphasis added), Dr. Marchis stated that meetings occurred "all the way from October through January," (*id.* at 332:18-19).

observation performed as part of the CSE's initial evaluation, AB was reported to have threatened to slash a female student in the face with a fist full of colored pencils – dangerous behavior consistent with other behavior in which he engaged in kindergarten.  (D's 56.1 Stmt. ¶ 22.)  A psychiatrist consultant used by the District performed a psychiatric evaluation of AB, and issued a report on November 25, 2017, that recited AB's history in kindergarten, including his cursing at teachers, requiring physical restraints, hitting, biting, kicking, and throwing objects (including furniture) in the classroom, threatening other students and trying to stab them with pencils or scissors, and attempting to run out of the classroom.  (*Id.* ¶ 23.)  The report stated that it sometimes took up to an hour for AB to calm down when he was upset, concluded that it was possible that AB had Attention Deficit Hyperactivity Disorder ("ADHD"), and mentioned his impulsivity and oppositional behaviors.  (*Id.*)

On November 30, 2017, the CSE had an initial eligibility meeting concerning AB.  (*Id.* ¶ 24.)  At that meeting, AB's teachers stated that his classmates were afraid of him because of his violent comments and provocative behaviors.  (*Id.*)  The CSE also considered a psychological evaluation commissioned by AB's parents that was consistent with the other information before the CSE and contained a diagnosis of oppositional defiant disorder and ADHD.  (*Id.* ¶ 21.)  The CSE concluded that AB should be classified as "emotionally disabled" and developed an individualized education program ("IEP") for the remainder of AB's kindergarten year.  (*Id.* ¶ 24.)  The IEP provided that he be placed in an integrated co-teaching environment with two teachers and a kindergarten aide in the classroom, and provided with individual thirty-minute counseling twice a month, a social skills group with the psychologist twice a month, and psychology consultations with AB's teachers concerning AB and the classroom environment.  (*Id.*)  It also called for a transition plan for AB to change to the new program.  (*Id.*)

During the November 30, 2017 meeting, CSE members were concerned because they did not know what was causing AB's dysregulated behavior and wanted to come up with a plan that would reduce and ultimately eliminate that behavior.  (*Id.* ¶ 25.)  At or before that meeting, Dr. Marchis explained to AS a plan that involved reinforcing AB's positive behavior with rewards for good behavior, shortening his school day to build up his stamina, and previewing changes in his program to address the escalation of negative behaviors caused by transitions.  (*Id.* ¶ 27.) AB's parents voiced no objection to the classification of AB as "emotionally disabled," but his father voiced concern about AB moving from his current kindergarten non-special education program, which had a foreign language component, to a special education environment, and the parents preferred that AB be placed in another classroom in the original program with a 1:1 aide. (*Id.* ¶ 26.)  AB completed kindergarten in the program proposed by the District at the November 30, 2017 meeting.  (IHO Decision at 26.)

On March 28, 2018, the District's CSE met for an annual review to prepare for AB's first-grade year and reviewed reports that AB was making good progress in his special education placement, although he was occasionally still engaging in high-intensity misbehaviors.  (D's 56.1 Stmt. ¶ 28.)  The CSE elevated the level of support for AB for his first-grade school year, recommending an increase in integrated co-teaching from three to four hours a day and a 1:1 aide for six hours and fifteen minutes each day to be with AB during lessons, meetings and independent work, and specials, gym, art, library, lunch and recess.  (*Id.* ¶ 29.)

During the first semester of AB's first-grade year, AS regularly communicated with school staff by phone or email and would receive reports about AB's behavior.  (*Id.* ¶ 47.)  AS concluded that although AB would sometimes need a break or have to be removed from class to address his dysregulated behavior, things were going reasonably well.  (*Id.*)  School staff were

optimistic that their interventions were working.  (*Id.*)  But during the second semester of AB's first-grade year, AS became aware that AB was engaging in disruptive and aggressive behavior on a daily basis, including trying to leave the class or the school premises, throwing objects in class, refusing to get up off the floor, and kicking, hitting, punching and biting.  (*Id.* ¶ 48.)  The District submits that the school staff notified AS of how they responded to AB's behaviors.  (*Id.*) Plaintiff does not dispute that she was in regular communication with school staff or that AB's problematic behavior was occurring on a daily basis, but asserts that she did not always receive daily behavior charts that would show if he had earned enough "checks" to go to recess or "choice time."  (P's 56.1 Resp. ¶ 48; *see* ECF No. 46-12 at 33-37.)

The District's CSE held three meetings with AB's parents in March, May, and July of 2019.  (D's 56.1 Stmt. ¶ 49.)  At the March meeting, AB's BIP was updated, and the CSE recommended additional services, including having the school psychologist come to the classroom for four hours a week to help teachers assist AB, to which AB's parents agreed.  (*Id.*) After that meeting, for the remainder of first grade, AB's dysregulated behaviors continued to escalate, and AB was seriously hurting staff and threatening to do so.  (*Id.* ¶ 50.)  The team working with AB did their best to provide him with educational programming – including providing instruction in the peace room when AB would accept it – but had to scale back and remove demands on AB to address the safety concerns caused by his conduct.  (*Id.* ¶ 51.)  At the May 29, 2019 CSE meeting, the District behavioral staff opined that AB was engaging in dysregulated behaviors as a way of avoiding tasks he did not want to do and that some of the strategies being used to address those behaviors were instead reinforcing them.  (*Id.* ¶ 53.)  The CSE recommended that AB be placed in a therapeutic out-of-district program for second grade because the school could not safely manage his behaviors, but AS asked the CSE to give AB

another chance to remain at the school on the basis that his behaviors were now under control and he would be safe to stay for second grade, (*id.* ¶ 54), even though AB's defiant behavior at home was actually increasing at that time, (*id.* ¶ 55).  The CSE accommodated AS's request that AB be given another chance, but also provided her with a list of New York State-approved therapeutic programs.  (*Id.* ¶ 54.)  The District developed an updated FBA and an updated BIP for AB in June 2019 at AS's request.  (*Id.* ¶ 56.)

At the July 2019 CSE meeting, held to review the progress of the search for a therapeutic out-of-district placement for AB, AS reported that she had not approved of either of the two programs she had visited, one of which AB attended as a trial, and that if she could not find an available program of which she approved, she wanted AB to remain at his school for second grade.  (*Id.* ¶ 57.)  AS further reported that AB had started medication two weeks before the end of the 2018-19 school year and that his behavior had not been a problem at a faith-based program he had attended all summer.  (*Id.*)  As an accommodation to AS, it was agreed that AB would return to the school for second grade under the program approved by the CSE at the March 2019 CSE meeting, rather than being placed on home instruction while AS continued to look for a therapeutic out-of-district program for AB that she would approve, with the understanding that if AB's problematic behavior returned to the level of the preceding year, the CSE would need to recommend pursuit of the therapeutic out-of-district placement.  (*Id.* ¶ 58.)

Unfortunately, AB's dysregulated behaviors of hitting, threatening, eloping, climbing on furniture, threatening to harm himself, kicking, biting, and cursing resumed at the start of his second-grade year.  (*Id.* ¶ 59.)  At that time he was no longer on the medication that he had been taking at the time of the July 2019 CSE meeting.  (*Id.* ¶ 60.)  Because of incidents of physical aggression that had resulted in multiple suspensions of AB during September 2019, the District

held a CSE meeting on September 27, 2019, during which it was reported that AB's negative behavior had returned to the level of the prior spring; that staff had scaled back academic demands for AB because his reactions to such demands were physically aggressive behaviors that were a safety risk to himself and others; that school staff were unable to help AB regulate his emotions; and that AB needed a smaller, more structured environment with continuous therapeutic support.  (*Id.* ¶ 61.)  The CSE recommended an out-of-district placement in a therapeutic day program and that, pending such a placement, AB receive four hours of daily home instruction each day unless the parents placed AB in a transitional Intensive Day Treatment ("IDT") program, an interim short-term non-CSE placement run by BOCES in which students receive both academic instruction and daily therapy until they transition to an appropriate placement.  (*Id.* ¶ 62.)

Following the September 27, 2019 CSE meeting, AB's parents visited the IDT program with AB's special education teacher and the school psychologist.  (*Id.* ¶ 63.)  AB attended the IDT program for several weeks until he was accepted and transitioned into a therapeutic out-of-district program at Pocantico Hills Elementary School that AS had approved.  (*Id.*)  The District asserts the AB was not compelled to attend the IDT program and AB's parents enrolled him by choice, but AB's parents assert that they did not voluntarily agree to his attendance in the IDT program and only placed him there because the District threatened to involve Child Protective Services if they did not agree to remove AB from the Mamaroneck Avenue School.  (P's 56.1 Resp. ¶ 63.)  With new medication, AB did well in the special class at Pocantico Hills Elementary School.  (D's 56.1 Stmt. ¶ 64.)

### 2.      Impartial Hearing Officer Decision

On October 15, 2019, AS requested a hearing before an Impartial Hearing Officer

("IHO") pursuant to the Individuals with Disabilities Education Improvement Act of 2004

("IDEA"), Section 504, the ADA, the Regulations of the New York State Commissioner of

Education, and the N.Y. Education Law.  (IHO Decision at 2.)  In the administrative proceedings

before the IHO, Plaintiff claimed that the District had violated Section 504 and the ADA by

repeatedly excluding AB from his classroom and isolating him from his peers because of his

disability, failing to provide him with appropriate behavioral interventions as a reasonable

accommodation resulting in the denial of meaningful access to the District's programs (including

an after-school program operated by a separate entity because the District did not authorize a 1:1

aide to attend with AB), and insisting that his parents accompany him on field trips.  (D's 56.1

Stmt. ¶ 1.)  AS sought, among other things, 405.3 hours of compensatory education to make up

for what she calculated to be the number of hours that the District unlawfully excluded AB from

his educational programming.  (ECF No. 46-9 at 30; P's 56.1 Stmt. ¶ 19.)

On March 10, 2021, the IHO issued his decision, finding that AB was not denied a free

appropriate public education ("FAPE") under the IDEA, Section 504, or the ADA, and denying

AS's request for relief.  (D's 56.1 Stmt. ¶ 2; IHO Decision at 43-46.)  AS had argued that the

District overused the peace room, which was subject to New York State regulations regarding a

"time out room."  (IHO Decision at 33-34.)  The IHO concluded that the "peace room" was a

"time out room" under the relevant regulation, and noted that the regulation provided that

"'[e]xcept for unanticipated situations that pose immediate concern for the public safety of a

student or others,'" a time out room was to be used "'only in conjunction with a behavioral

intervention plan that is designed to teach and reinforce alternate appropriate behaviors.'"  (IHO

Decision at 34 (quoting 8 NYCRR § 200.22(c)).)  The IHO found that the peace room and the necessary restraint to transport AB there were proper based on the physical safety of the student or others.  (D's 56.1 Stmt. ¶ 3; IHO Decision at 34.)  Under the IDEA, the IHO found that "[AB's] educational program was appropriate based on his evaluations," and "any procedural inadequacies did not impede [AB's] right to a FAPE, significantly impede the parents' opportunity to participate in the decision-making process or cause a significant deprivation of educational benefits."  (IHO Decision at 45.)  Under Section 504 and the ADA, the IHO found that AB was not denied a FAPE, or excluded from participation in or denied the benefits of the District's programs by reason of his disability.  (*Id.*)

### 3.    State Review Officer Decision

On April 19, 2021, Plaintiff sought review of the IHO Decision by filing an appeal with the State Review Officer ("SRO").  (D's 56.1 Stmt. ¶ 4; ECF No. 46-10.)  Plaintiff raised the following as one of four issues:  "Did the IHO err when it held that the District did not violate §504/ADA by:  1) repeatedly segregating [A.B.] from his peers due to his behaviors, (2) denying him behavioral accommodations that would give him access to District programs, and (3) requiring [A.B.'s] parents to accompany him on field trips, but not imposing the same condition on other children?"  (D's 56.1 Stmt. ¶ 4; ECF No. 46-10 at 2.)  Plaintiff again requested 405 hours of compensatory education.  (ECF No. 46-8 ("SRO Decision") at 9.)  In a May 20, 2021, decision, the SRO held that it had "no jurisdiction to review any portion of the parents' claims regarding violations of section 504 or the ADA," "as an SRO's jurisdiction is limited by State law to matters arising under the IDEA and Article 89 of the Education Law."  (SRO Decision at 14, 56; *see* D's 56.1 Stmt. ¶ 5.)

With respect to Plaintiff's claims related to the peace room and restraints, the SRO agreed with the IHO that the "peace room" was a "time out" room, but found that the District's policy on use of that room did not comply with State regulations, because the policy lacked required specifics "such as prohibitions on placing a student in a locked room or a room in which the student cannot be continuously observed; circumstances under which the time out room may be used; data collection to monitor the effectiveness of the use of the time out room; information that would be provided to parents; and staff training on the policies and procedures on the use of the time out room." (P's 56.1 Stmt. ¶¶ 9, 10; SRO Decision at 44.) The SRO found that "[i]n contravention of State regulation, the student's IEPs did not reference the use of the time out room or the maximum amount of time the student would need to be in the room as a behavioral consequence." (SRO Decision at 45; *see* P's 56.1 Stmt. ¶ 16.) The SRO concluded that "while the district's intentions were well-meaning, the use of the peace room for multiple purposes and in response to varying precipitating factors was itself problematic as the room ultimately might have come to reinforce the student's escape/avoidance behaviors." (D's 56.1 Resp. ¶ 11; SRO Decision at 43.) She concluded that the District had failed to follow regulatory requirements regarding the use of time out rooms, (SRO Decision at 44-45), and that its use of the peace room to manage AB's behaviors "resulted in lost educational time and a denial of a FAPE," (*id.* at 47). As to physical restraints, however, the SRO held that there was "insufficient basis in the hearing record to modify the IHO's determination that the district's use of restraints on [AB] was appropriate." (*Id.* at 48.) The SRO also held that the District had failed to follow the proper procedures (including clearing the change in placement with an IHO) before placing AB in the IDT program, and that it therefore could not rely on that placement as offering AB a FAPE. (*Id.* at 42.)

Regarding the compensatory education award, the SRO accepted AS's calculation of lost educational time, but because she determined that the District only denied AB a FAPE based on the improper use of the peace room and improper removal of AB to the IDT program, she held that the compensatory education award should be limited to the portion related to those violations.  (*Id.* at 49-50.)  Thus, the SRO awarded 57.8 hours based on AB's removals to the peace room and one hour per day for each of the 37 days that AB attended the IDT program, (*id.*), for a total of 94.8 hours of compensatory tutoring, (*id.*; *see* P's 56.1 Stmt. ¶ 19).[3]

## B.   Procedural History

Plaintiff filed this lawsuit on August 17, 2021,[4] seeking relief under Section 504 and the ADA on the basis of the District's "repeated unlawful use of restraint and seclusion," AB's inability to access his education for 405 hours during kindergarten, first grade and second grade, and AB's suffering severe physical harm and emotional distress.  (ECF No. 9 ("Compl.") ¶ 2.)[5]

---

[3] The District appealed the SRO Decision, seeking reversal of the award of 37 hours of compensatory education for AB's placement in the IDT program.  *See Complaint*, *Bd. of Educ. of Mamaroneck Union Free Sch. Dist. v. D.B. & An.S.*, No. 21-CV-7596 (S.D.N.Y.) ¶¶ 41-45.  The District's motion for summary judgment is pending in that action.

[4] The initial complaint, (ECF No. 1), was sealed because the minor child's name was inadvertently included in one paragraph, (*see* ECF No. 6).  Pursuant to the Court's order, the complaint was refiled to substitute the child's initials, and the refiled complaint is the operative complaint, deemed to have been filed on August 17, 2021.  (ECF No. 7.)

[5] Although the SRO awarded AB 94.8 hours of compensatory tutoring, "[i]n this action under the ADA and Section 504, [AB] seeks relief for *all* 405.3 hours that the District denied [AB] access to his educational programming."  (ECF No. 53 ("P's Mem.") at 3 (emphasis in original).)  Plaintiff asserts that because "[a] preclusive factual finding establishes that the District excluded A.B. from his educational programming for 405.3 hours," "the District should provide A.B. with 405.3 hours of compensatory education, to use for reasonable educational, rehabilitative, therapeutic, or recreational programming at parent's own election."  (ECF No. 27 at 3.)  What the SRO found, however, is that AS's calculation that AB had been removed from class for 57.8 hours, suspended for 16.5 days and in the IDT program for 37 days correctly totaled 405.3 hours.  (SRO Decision at 49-50.)  She did not find that each of those hours was wrongful or required hour-by-hour compensatory tutoring.  To the contrary, she found that only

Plaintiff initially sought compensatory damages, compensatory education, and attorneys' fees and expert witness costs, (*id.* ¶¶ 65-67), but she has since dropped her request for damages because the Supreme Court held in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, *reh'g denied*, 142 S. Ct. 2853 (2022), that emotional distress damages are not recoverable under Section 504, and several courts have held that this likely bars such damages under the ADA, (ECF No. 27 at 1 n.2).[6]

Defendant answered on November 10, 2021.  (ECF No. 11.)  After the close of fact discovery, the District and Plaintiff filed pre-motion letters in anticipation of their motions for summary judgment, (ECF Nos. 25, 27), and each responded to the other's, (ECF Nos. 28, 31). The Court then held a pre-motion conference, (*see* Minute Entry dated October 19, 2022), and the instant motions followed.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

---

one hour per day was necessary to remedy the IDT violation and that only the removals from the classroom had to be remedied at a one-to-one ratio.  (*Id.* at 50.)

[6] Indeed, courts in this Circuit have held, after *Cummings*, that emotional distress damages are not available under the ADA or the Rehabilitation Act.  *See, e.g.*, *Matagrano v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 19-CV-763, 2023 WL 5932943, at *7 (N.D.N.Y. Sept. 12, 2023); *Doherty v. Bice*, 18-CV-10898, 2023 WL 5103900, at *6 (S.D.N.Y. Aug. 9, 2023) (collecting cases).

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory

allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423,

428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an

affidavit or declaration is used to support or oppose the motion, it "must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party

fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court

may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if

the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

This same standard applies to cross-motions for summary judgment.  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. County of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014).  Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).  But where, as here, the motion and cross-motion seek a determination of the same issues, the Court can consider them together. *Chartis Seguros*, 3 F. Supp. 3d at 179; *Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015).

## B.    The ADA and Section 504

"The ADA and Section 504 both protect 'qualified individual[s] with a disability.'"  *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (alteration in original) (quoting 42 U.S.C. § 12132 (ADA) and 29 U.S.C. § 794(a) (Section 504)).  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  "Apart from the Rehabilitation

Act's limitation to denials of benefits solely by reason of disability and its reach of only federally

funded – as opposed to public – entities, the reach and requirements of both statutes are precisely

the same." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002).

"Because the standards adopted by the two statutes are nearly identical," courts in this circuit

"consider the merits of these claims together." *B.C.*, 837 F.3d at 158; *see Rodriguez v. City of

N.Y.*, 197 F.3d 611, 618 (2d Cir. 1999) (assessing ADA and Section 504 claims together).

A plaintiff asserting a discrimination claim under the ADA or Section 504 must show the

following:  "(1) plaintiff is a qualified individual with a disability; (2) plaintiff was excluded

from participation in a public entity's services, programs or activities or was otherwise

discriminated against by the public entity; and (3) such exclusion or discrimination was due to

plaintiff's disability." *B.C.*, 837 F.3d at 158.  Discrimination can include the failure to provide a

reasonable accommodation.  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004)

("In short, the Rehabilitation Act and Titles II and III of the ADA prohibit discrimination against

qualified disabled individuals by requiring that they receive 'reasonable accommodations' that

permit them to have access to and take a meaningful part in public services and public

accommodations."), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004); *Bahl v. N.Y. Coll. of

Osteopathic Med. of N.Y. Inst. of Tech.*, No. 14-CV-4020, 2023 WL 4673007, at *5 (E.D.N.Y.

July 21, 2023) ("Under the third prong, an educational institution may be found liable if it fails to

offer reasonable accommodations for a student's known disability unless the accommodation

would impose an undue hardship on the operation of its program, or fundamentally alter the

nature of the service, program, or activity."); *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F.

Supp. 2d 660, 679 (E.D.N.Y. 2012) ("Discrimination on the basis of a disability includes not

making reasonable accommodations for a person otherwise qualified with a disability."), *aff'd*

*sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013) (summary order).  Here, there is no dispute that AB is a qualified individual with a disability or that the District is a public entity subject to the ADA and Section 504.

In the special education context, an ADA or Section 504 claim "may be predicated on the claim that a disabled student was denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 841 (2d Cir. 2014).  But "because the ADA and Rehabilitation Act address discrimination against disabled students, rather than incorrect or erroneous special education treatments, a plaintiff challenging a school district's response to his disability can succeed only by demonstrating that a school district acted with bad faith or gross misjudgment." *Piotrowski v. Rocky Point Union Free Sch. Dist.,* No. 18-CV-6262, 2023 WL 2710341, at *7 (E.D.N.Y. Mar. 30, 2023); *see C.L.*, 744 F.3d at 841 ("Such a claim . . . requires proof of bad faith or gross misjudgment."); *R.B. ex rel. L.B. v. Bd. of Educ.*, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000) (Under the ADA or Section 504, "a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP to establish liability; a plaintiff must show that defendants acted with bad faith or gross misjudgment."); *C.L. v. Scarsdale Union Free Sch. Dist.*, 10-CV-4315, 2012 WL 983371, at *16 (S.D.N.Y. Mar. 22, 2012) ("Even if Defendant violated the IDEA by failing to provide [the child] with a FAPE, without actual evidence of bad faith or gross misjudgment, this failure simply does not translate into a violation of the Rehabilitation Act."), *aff'd in part, rev'd in part on other grounds*, 744 F.3d 826 (2d Cir. 2014).  "Courts have equated gross misjudgment with deliberate or reckless indifference." *J.L. on behalf of J.P. v. N.Y.C. Dep't of Educ.*, 324 F. Supp. 3d 455, 468 (S.D.N.Y. 2018) (collecting cases); *see S.B. v. Goshen Cent. Sch. Dist.*, No. 20-CV-9167, 2022 WL 4134457, at *15-16 (S.D.N.Y. Sept. 12, 2022)

(intentional discrimination may be inferred from bad faith, gross negligence or reckless or deliberate indifference to the student's federally protected rights).

III.   **DISCUSSION**

   A.   ***Res Judicata* and Collateral Estoppel**

The District argues that it is entitled to summary judgment on two grounds.  First, it contends that Plaintiff's action is barred by the doctrines of *res judicata* and collateral estoppel, based on the IHO's undisturbed conclusion that the District did not violate the ADA or Section 504.  (*See* ECF No. 47 ("D's Mem.") at 12-14.)  Plaintiff argues that *res judicata* and collateral estoppel do not bar this action because she is asserting discrimination claims that are separate and distinct from the IHO's decision that AB was not denied a FAPE under those statutes.  (*See* P's Mem. at 8-10.)

Whether *res judicata* or collateral estoppel applies to the IHO's finding that AB received a FAPE as required by Section 504 and the ADA depends in part on whether the Complaint here is properly characterized as an appeal from the IHO's decision regarding a FAPE or as a plenary action for discrimination apart from provision of a FAPE.  If the Complaint is properly characterized as an appeal from the IHO decision, *res judicata* and collateral estoppel would not apply, but the standard of review would be modified *de novo* review, *see C.L. v. Scarsdale Union Free Sch. Dist.*, 913 F. Supp. 2d 26, 33 (S.D.N.Y. 2012); *M.R. v. S. Orangetown Cent. Sch. Dist.*, No. 10-CV-1800, 2011 WL 6307563, at *6 (S.D.N.Y. Dec. 16, 2011), meaning I would have to give "due weight" to the IHO's decision, *see C.L.*, 913 F. Supp. 2d at 33.  If the Complaint is a plenary action for discrimination apart from provision of a FAPE, then the standard of review could arguably be *de novo* or modified *de novo*, *compare K.N. v. Gloucester City Bd. of Educ.*, 379 F. Supp. 3d 334, 344 (D.N.J. 2019) (applying *de novo* standard where Section 504 and ADA

claims were brought in administrative proceedings only because of exhaustion requirement), *with Zion M. through Gabrielle M. v. Upper Darby Sch. Dist.*, No. 21-CV-2941, 2023 WL 6299091, at *7 (E.D. Pa. Sept. 27, 2023) (modified *de novo* review applies to Section 504 and ADA claims), but the IHO's findings might be entitled to preclusive effect, *see GV v. Bd. of Educ. of W. Genesee Cent. Sch. Dist.*, No. 15-CV-1173, 2017 WL 3172417, at *3 (N.D.N.Y. July 25, 2017) ("[T]he IHO's decision – which explicitly found that the District did not violate Section 504 or the ADA – stands as a final administrative adjudication to the extent that it was not reviewed by the SRO," and is entitled to preclusive effect).

I need not resolve this issue, because even assuming that there is no preclusive effect from the IHO ruling and nothing to which I should defer, Plaintiff has not shown a Section 504 or ADA violation, as further discussed below.

### B.   Whether the District Discriminated Against AB

Plaintiff's theory under the ADA and Section 504 appears to be primarily that AB was entitled to a reasonable accommodation in the form of "[u]se of behavioral interventions based on peer-reviewed research," (Compl. ¶¶ 48, 56), although she does not specify what those interventions should have been.  The District contends that in any event Plaintiff has not shown that the District acted in bad faith or demonstrated gross misjudgment or deliberate indifference. (*See* D's Mem. at 18.)  I agree.

The parties agree that the third element of the claim (discrimination because of disability) does not require personal animosity or ill will, *see Rutherford v. Fla. Union Free Sch. Dist.*, No. 16-CV-9778, 2019 WL 1437823, at *34 (S.D.N.Y. Mar. 29, 2019), but requires more than a failure to provide a FAPE, *see French v. New York State Dep't of Educ.*, 476 F. App'x 468, 473 (2d Cir. 2011) (summary order), and a state of mind greater than negligence, *Biondo v. Kaledia Health*, 935 F.3d 68, 74 (2d Cir. 2019).  (D's Mem. at 15; P's Mem. at 20-21; ECF No. 58 ("D's

Reply Mem.") at 8 n.8.)  Plaintiff argues that the claim should be evaluated under the deliberate

indifference standard, while Defendant contends that Plaintiff must establish that the District

acted with bad faith or gross misjudgment.  (P's Mem. at 21 n.4.)  As noted, "[i]t is not clear

whether [the] 'deliberate indifference' standard is at all different from the 'bad faith or gross

misjudgment' formulation . . . ."  *Myslow v. New Milford Sch. Dist.*, No. 03-CV-496, 2006 WL

473735, at *9 (D. Conn. Feb. 28, 2006).  But even assuming that the former is more Plaintiff-

friendly and is the correct standard, the evidence does not establish that the District acted with

deliberate indifference, much less bad faith or gross misjudgment.

       To meet the required standard, a plaintiff must show that a defendant "acted with at least

deliberate indifference to the strong likelihood that implementing its policy or custom would

violate federally protected rights."  *K.A. v. City of N.Y.*, 413 F. Supp. 3d 282, 304 (S.D.N.Y.

2019).  In other words, deliberate indifference is demonstrated by showing that the defendant

appreciated that its conduct would run a serious risk of violating federal rights, but continued the

conduct anyway.  This generally requires "an official who at a minimum [1] has authority to

address the alleged discrimination and to institute corrective measures on the recipient's behalf

[2] has actual knowledge of discrimination in the recipient's programs and [3] fails adequately to

respond."  *Biondo*, 935 F.3d at 73.  But "knowledge that an individual has a disability and a

failure to offer an accommodation is not sufficient to establish deliberate indifference.  A

plaintiff must instead demonstrate a failure to act in the face of actual knowledge that the

disabled individual requires an [accommodation], under such circumstances where the level of

indifference is so pervasive as to amount to a choice."  *Viera v. City of N.Y.*, No. 15-CV-5430,

2018 WL 4762257, at *17 (S.D.N.Y. Sept. 30, 2018).  "[A]llegations that one would have or

should have known will not satisfy the knowledge prong of deliberate indifference."  *A.G. v.*

*Lower Merion Sch. Dist.*, 542 F. App'x 194, 198 (3d Cir. 2013).  Deliberate indifference "must reflect a deliberate choice among various alternatives and may not be inferred from mere negligence or bureaucratic inaction." *Biondo*, 935 F.3d at 74.

Plaintiff argues that the District discriminated against AB by (1) inappropriately using the time out room, (2) developing inappropriate behavioral programming, and (3) inappropriately using restraints.  (*See* P's Mem. at 20-23.)  With respect to the use of the time out room, that the SRO found that the District's policy did not comply with State regulations and thus its use of that room deprived AB of a FAPE, (*see* SRO Decision at 45-47), does not alone establish deliberate indifference.  If that were enough, the mere denial of a FAPE would virtually always also amount to a Section 504 or ADA violation.  *See French*, 476 F. App'x at 473 (plaintiff must show alleged discrimination is something "more than a rehashing of her allegation that the defendants failed to provide her with a FAPE"); *cf., e.g.*, *Telesford v. Annucci,* No. 16-CV-793, 2017 WL 3600941, at *6 (N.D.N.Y. July 26, 2017) ("[I]t is well settled that violations of state regulations, standing alone, are not cognizable under § 1983").  It is undisputed that AB's behavior sometimes required his removal from the classroom, and the record reflects, as the IHO concluded, that AB was placed in the time out room for physical safety reasons.  That the District's written policies regarding the peace room fell short of state standards (by not specifying how long a student could stay there, keeping data as to its effectiveness or mentioning it specifically in AB's IEP) simply does not rise to the level of deliberate indifference to AB's needs.  Likewise, that the removals negatively impacted AB's educational program, and at some point might even have reinforced his maladaptive behaviors, may show that the District could have made better or different decisions, but does not show that in making the decisions it did make, the District appreciated that it was likely violating AB's rights but did not care.  Plaintiff

has not provided evidence from which a rational factfinder could conclude that in placing AB in the time out room, the District understood that it would violate his federally protected rights and made a deliberate choice to do so anyway.

Similarly, Plaintiff has not shown that the District was deliberately indifferent in its development of behavioral programming or use of restraints.  Plaintiff's allegations "that the District's behavioral supports and use of restraints fell far short of professional standards of appropriateness" and "fail[ed] to comply with research-based standards," (P's Mem. at 23), might suggest negligence but does not rise to the level of deliberate indifference.  The District may not have done everything right, but there is no evidence from which a rational factfinder could conclude that its failings resulted from the intentional or reckless disregard of AB's rights. To the contrary, its record of close attention to AB's needs through constant meetings, communications and adjustments precludes a finding that the District was deliberately indifferent to AB's rights.  School personnel acted diligently and thoughtfully in their consideration of AB; kept in close contact with his parents; met with them regularly to discuss AB's behavior and how it could be addressed; carefully considered the reports and other information provided; made modifications in attempts to improve the situation; and accommodated AS's request to have AB remain at the school despite their view that he needed a therapeutic out-of-district program.  The record shows, as the SRO held, that the "district's intentions were well-meaning," (SRO Decision at 43), and "appropriate and thoughtful," (*id.* at 55) – a mindset inconsistent with a claim of deliberate indifference.

AB's early school years were no doubt extremely challenging for his parents and educators alike.  But the difficulties did not arise from lack of effort or concern on the part of the District.  To the contrary, "the record shows that [District] teachers and administration tried

repeatedly to work together to help [AB] refocus . . . and to control or diminish the number and extent of [AB's] emotional and physical outbursts." *K.C. v. Chappaqua Cent. Sch. Dist.*, No. 16-CV-3138, 2019 WL 6907533, at *9 (S.D.N.Y. Dec. 19, 2019).  Plaintiff naturally "may have experienced frustration with the content, implementation, and effectiveness of the IEPs and with [AB's] continued behavioral issues, but that alone does not establish that the District acted with gross negligence or reckless indifference." *Id.*  Plaintiff has not provided evidence from which a rational factfinder could conclude that the District intentionally discriminated against AB in violation of Section 504 or the ADA.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the District's motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 44, 49), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated:  January 26, 2024
          White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.

24